## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALEXANDER MOFFA,** | : | **Civil No. 3:24-CV-442** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **LELAND DUDEK,** | : | |
| **Acting Commissioner of Social Security,[1]** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

This Social Security appeal presents a curious variation on a familiar theme, the evaluation of medical opinion evidence. The plaintiff, Alexander Moffa, suffers from a cascading array of severe emotional impairments including schizotypal disorder; other specific personality disorders; social phobia, generalized; anxiety disorder, unspecified; and attention deficit hyperactivity disorder (ADHD), combined type. (Tr. 19). These disorders directly affect Moffa's ability to meet the

---

[1] Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

emotional demands of the workplace. In particular, it is undisputed that this complex combination of impairments impacts Moffa's ability to adapt to workplace changes and undermines his capacity to interact with others.

With respect to these spheres of workplace functioning, every opining expert who actually interacted with Moffa concluded that he suffered from marked or extreme impairments in terms of adapting and interacting with others. Thus, an examining consulting source, Dr. Sari Fleischman, concluded that he suffered from marked impairments in adapting and interacting with others. Moffa's treating source, CRNP George Weaver, in turn, found that Moffa was markedly impaired in adapting to workplace change, and was extremely impaired when it came to interacting with others.

The Administrative Law Judge (ALJ) who heard this case, however, rejected the medical opinion of every expert who actually interacted with Moffa concerning his severely limited ability to interact with others. Instead, the ALJ found the opinions of non-treating, non-examining state agency experts who reached much more benign conclusions without ever treating or examining Moffa more persuasive on this issue. Thus, the ALJ's decision rested on the somewhat counter-intuitive proposition that experts who never interacted with Moffa were better positioned to

assess his ability to interact with others than medical experts who actually examined, treated, and interacted with the plaintiff.

The ALJ justified this conclusion by asserting, in a summary fashion, that the examining and treating expert opinions were "inconsistent with the overall evidence of record." (Tr. 26). Yet, the clinical record contained multiple references to a host of significant mental health symptoms repeatedly displayed by Moffa in the course of his treatment. Moreover, oddly, the ALJ bolstered this conclusion that the treating examining source opinions were unpersuasive by citing to evidence which included these opinions. Thus, the ALJ's decision rested, in part, upon the curious and unexplained assertion that the experts' own opinions somehow constituted evidence which undermined and contradicted those opinions.

An ALJ has a responsibility to adequately articulate the basis for medical opinions evaluations. In this regard "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)). Rather, the ALJ must consider all the evidence and give an articulable reason grounded in the evidence for discounting the evidence she rejects. Id.

3

In the instant case we conclude that the ALJ's burden of articulation has not been met in this case since the ALJ's decision rejects the opinions of all those medical experts who interacted with Moffa on grounds which are not clearly and fully articulated. Accordingly, we will remand this case for further consideration and evaluation of the medical opinion evidence.

## II.    Statement of Facts and of the Case

### A. Introduction

On May 3, 2021, Alexander Moffa filed an application for supplemental security income benefits alleging an onset of disability beginning February 10, 2021. (Doc. 17). According to Moffa, he was disabled due to the complex combination of profound emotional impairments, including schizotypal disorder; other specific personality disorders; social phobia, generalized; anxiety disorder, unspecified; and attention deficit hyperactivity disorder (ADHD), combined type. (Tr. 19). Moffa was born on September 3, 1986, and was 34 years old at the time of this disability application. (Tr. 27).

### B. Moffa's Clinical Record

The emotional impairments claimed by the plaintiff were well documented in Moffa's treatment records. Indeed, those clinical records were replete with references to the severe symptoms experienced by Moffa at various times, including

depression, frequent obsessive thoughts of death, grandiose, bizarre and delusional

ideas, tangential thinking and flight of ideas.[2]

---

[2] See the following examples which have been culled by plaintiff's counsel from the administrative record: Illogical thinking. (Tr. 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698); Perceptual disturbances. (Tr. 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698); Depression. (Tr. 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596; 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698; 704; 707; 714; 717); Preoccupations. (Tr. 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698; 704; 707; 714; 717; 727); Flight of ideas. (Tr. 501; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596; 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698; 704); Loose associative thinking. (Tr. 501; 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582-83; 596); Irritability. (Tr. 422; 434; 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); Limited/poor judgment. (Tr. 519; 524; 527; 531; 534; 538; 545; 554; 558; 561; 568; 570; 574; 583; 596); Limited insight. (Tr. 531; 534; 538; 545; 554; 558; 561; 568; 570; 574; 583; 596); Bizarre delusions. (Tr. 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 583; 596; 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698; 704; 707; 714; 717; 727); Ideas of influence. (Tr. 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 583; 596); Obsessions. (Tr. 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 583; 596); Paranoia. (Tr. 515; 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582-83; 596); Bizarre, toxic, and unkempt demeanor, (Tr. 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); Compulsivity. (Tr. 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); Delusional ideation. (Tr. 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596; 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 693; 698; 704; 707; 714); Guarded thinking. (Tr. 518; 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); Mild to moderate distress. (Tr. 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); Confused. (Tr. 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 596); Suspicious attitude. (Tr. 524; 527; 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); Anxious. (Tr. 434; 527; 530; 534; 544; 554; 557; 560; 567; 570; 573; 582; 596); Flat speech. (Tr. 636; 642; 646; 652; 656; 659); Tangential thinking/thought processes. (Tr. 501; 702; 707; 714; 717; 727); Flat affect. (Tr. 406; 434; 440; 515; 518; 524; 527; 624; 627; 637; 642; 646;

For example, during an August 3, 2020 mental health initial assessment at CenClear Moffa:

> reported that he can stay up for three days and then starts to hallucinate. . . . He stays up [because] his voice tells him about his death (racing thoughts) [Moffa] appears preoccupied with death and whats beyond our worldly capacity. He explained how it's difficult for him to understand how people can go on living their life knowing what he knows. [Moffa's] statements included "Once you understand the galaxy... like Earth, we are doomed... I don't understand how people pretend..."

(Tr. 479). In the course of this intake session, Moffa scored positive for a high degree of depression, and his caregivers initiated a safety plan for him. (Tr. 484-85). He also displayed "delusional grandiose thinking, metaphorical thinking, and preoccupation with death." (Tr. 487). Caregivers further documented that Moffa:

> stated he is a "bag-a-bon" [vagabond] and his name is in reference to Alexander the Great. He stated during this intake, he is trying not to wear a mask and be truthful as he can without alterations.

According to these intake notes:

> There appears to be some magical, preoccupied, and unusual perceptual experiences . . . . He did explain[] difficulty connecting or even caring about people. He doesn't feel things and has excessive social anxiety causing withdraw from society. Alexander referred to himself as having

---

652; 656; 659); Impaired recent/remote memory skills. (Tr. 441); Restless motor activity. (Tr. 501); Decreased impulse control. (Tr. 501); Anxious and flat attitude. (Tr. 515; 518; 544; 554; 557; 560; 567; 570; 573; 582; 596); Subdued mood. (Tr. 624; 627; 636; 642; 646; 652; 656); Anxious and demented affect. (Tr. 530; 537; 544; 554; 557; 560; 567; 570; 573; 582; 596); and Impaired/decreased attention span. (Tr. 501; 624; 627; 637; 642; 647; 653; 656; 659; 674; 677; 683; 686; 693; 698; 704; 707; 714).

> a "borge identity " perhaps in reference to Jorge Luis Borges, a Spanish
> - writer from the 1940 's. Other [symptoms] include flat affect,
> numbness, lack of drive or motivation. He stated he is apathetic which
> is apparent during the intake.

(Tr. 488).

> Likewise, a November 5, 2020, CenClear treatment note observed that Moffa:
>
> has the following symptoms of schizotypal personality disorder:
>
> Being a loner and lacking close friends outside of the immediate family
> Flat emotions or limited or inappropriate emotional responses
> Persistent and excessive social anxiety
> Incorrect interpretation of events, such as a feeling that something that
> is actually harmless or inoffensive has a direct personal meaning
> Peculiar, eccentric or unusual thinking, beliefs or mannerisms
> Suspicious or paranoid thoughts and constant doubts about the loyalty
> of others
> Belief in special powers, such as mental telepathy or superstitions
> Dressing in peculiar ways, such as appearing unkempt or wearing oddly
> matched clothes.

(Tr. 403).

In March of 2021, Moffa once again reported that he can stay up for three days and then starts to hallucinate. (Tr. 424). While CenClear treatment notes from April through June 2021, were fairly unremarkable, (Tr. 408-23), by July 2021, it was noted that Moffa was becoming more aggressive, displayed a guarded rapport and a flat affect. (Tr. 432-34).

Between July of 2021 and January of 2023, Moffa received treatment at a second provider, Huntingdon Counseling and Psychiatric Services. (Tr. 497-729).

The records of this health care provider continued to document ongoing and often intractable serious mental health symptoms. For example, at intake Moffa reported experiencing depression and encountering difficulties in a host of emotional arenas on a daily or weekly basis. (Tr. 497). Moffa's intake interview further underscored the depth of his impairments, in that Moffa:

> reports persistent and excessive social anxiety making it difficult for him to even answer the telephone. He describes himself as eccentric and different from most people. He also describes the ability to read others thoughts and motivations during social interactions. His answers to questions during the intake were often vague or rambling having little to do with the question asked.

(Tr. 499). It was determined that Moffa met multiple diagnostic criteria for both schizotypal personality disorder and persistent depression. (Tr. 501-02). Follow up treatment notes during the ensuing two years continued to document a host of profound symptoms. These included an obsession with death, recurring nightmares, social isolation, racing thoughts, and depression. (Tr. 506-07, 512). Moffa: "indicated that he is just existing in today's society. He feels 'disconnected' and has not been able to trust any humans.. . . . [And he] indicated that he views humans as animals." (Tr. 515).

By September of 2021 Moffa was: "displaying a delusional mindset. [He was] discussing the 'societal contract' that might be helpful to the world. [He] discussed infectious diseases [and] is comparing his thoughts to infectious diseases and

8

poisons. . . . [Moffa] is talking about death and how it plays a part in society. [He] reports that he thinks of death constantly." (Tr. 518). Throughout his treatment, Moffa consistently acknowledged "associated aggression, anxiety, depression, irritability, low self-esteem, talkative and overwhelming feelings." (Tr. 524 *passim*). Moffa also noted that these symptoms had rendered him unemployable explaining "that he tried to get jobs in the past and either the employer did not hire him or he was fired due to his mental health." (Tr. 527, 530).

Beginning in November 2021, and continuing through the Spring of 2022, Moffa was consistently described as appearing "bizarre, toxic and unkempt" and his affect was characterized as "more anxious and more demented." (Tr. 554, 557, 560, 567, 570, 573, 582, 596). Beginning in the Spring of 2022, and continuing throughout the year, caregivers repeatedly stated that Moffa's: "Thought processes demonstrate delusional ideation, flight of ideas, illogical thinking and perceptual disturbances. Associative thinking is intact. Patient demonstrates bizarre delusions, depression and preoccupations." (Tr. 624, 627, 637, 642, 647, 653, 656, 659, 674, 677, 683, 686, 693, 698, 707, 714). By August 2022, Moffa acknowledged "that he is in a constant state of  cognitive dissonance, making him get the feeling of exploding out of his skin." (Tr. 673). One month later, in September of 2022, Moffa informed his caregivers that he "continues to be cognitively dissonant, and feeling

as though he could crawl out of his skin. He feels as though he is in constant fight or flight mode." (Tr. 685).[3] By October 2022, Moffa was described as "on edge" and: "Reports impairment in social interactions is unchanged. Reports impairment in initiating or sustaining conversation is ongoing. Reports abnormal functioning in language used in social communication." (Tr. 692). He also continued to "demonstrate[] bizarre delusions, depression and preoccupations." (Tr. 693). Treatment notes consistently reflected these impairments throughout the latter half of 2022, and also stated that Moffa's medications were "[n]ot working." (Tr. 714). In January of 2023, Moffa described his condition as unchanged, repeated that his medications were not working, and was described as "demonstrat[ing] bizarre delusions, depression and preoccupations." (Tr. 717). On January 26, 2023, the last treatment record for Moffa from Huntingdon Counseling found that his: "Thought processes demonstrate tangential thinking. Associative thinking is intact. Patient demonstrates bizarre delusions and preoccupations." (Tr. 727).

---

[3] Curiously, notwithstanding these persistent reports, there was a single entry in Moffa's clinical files from September 2022 stating: "As paradoxical as this is expressed: patient is achieving a functional interaction with interpersonal relationships in the community." (Tr. 679). This paradox is never further explained and is not repeated in the treatment history which otherwise describes profound ongoing mental impairments. Nonetheless, the ALJ seized upon this single paradoxical entry to largely discount the reported severity of Moffa's symptoms as described over a two and one half year period.

## C. **The Medical Opinion Evidence**

Given the persistent reports of Moffa's "bizarre, toxic and unkempt" appearance, "more anxious and more demented" affect, and his "bizarre delusions, depression and preoccupations," it is hardly surprising that every medical professional who treated or examined the plaintiff concluded that he was profoundly impaired in terms of adapting to workplace change and interpersonal contact with others at work. Thus, on July 22, 2021, Dr. Sari Fleischman, a consulting, examining expert, conducted an examination of Moffa. (Tr. 439-445). In the report of this examination, Dr. Fleischman found that Moffa was moderately impaired in terms of his ability to make complex work-related decisions and follow complex instructions. (Tr. 443). However, according to Dr. Fleischman, Moffa displayed marked limitations interacting with the public, supervisors, and co-workers and was markedly limited in responding to workplace changes. (Tr. 444).

Likewise, on March 17, 2023, Moffa's primary treating source CRNP George Weaver provided a comprehensive assessment of the disabling effects of his emotional impairments. (Tr. 838-40). In this evaluation, CRNP Weaver opined that Moffa suffered marked impairments in multiple spheres of workplace functioning including: Following work rules; relating to co-workers; interacting with supervisors; dealing with work stress; functioning independently; maintaining

11

attention and concentration; understanding, remembering and carrying out complex, detailed, or simple job instructions; maintaining personal appearance; and behaving in an emotionally stable manner. (Tr. 838-39). CRNP Weaver, in turn, observed that Moffa would also be extremely impaired in terms of his ability to relate predictably in social situations; demonstrate reliability; deal with the public; and use judgment. (Id.)

The narrative accompanying this evaluation mirrored the longitudinal clinical findings from this treatment provider and painted a telling picture of Moffa's emotional fragility. As CRNP Weaver explained, Moffa's "limitation[s] center around the diagnosis of schizotypal personality disorder: characterized by: social and interpersonal deficits (reduce capacity) for close relationships[;] Cognitive distortions[;] odd beliefs or magical thinking/behavior that is inconsistent with cultural norms[;] suspicious and paranoid thinking[;] excessive social anxiety that does not diminish with familiarity." (Tr. 838). CRNP Weaver explained:

> While fitting diagnostic criteria for social phobia, the schizoid personality disorder is the main driver for the patient's disability. Patient also has cluster a personality disorder traits. Personality disorders have a poor prognosis and do not respond to treatment. Personality disorders are established early in life. This provider has encouraged this patient to apply for disability. Patient with significant history of isolating from public including isolating from family.

(Tr. 839).

12

CRNP Weaver concluded that:

> While employment would be beneficial to the patient, the severe isolating behaviors due to the personality disorder will make employment extremely difficult for this patient. Attendance would be very unpredictable and sporadic. Reliability in performing task would be unpredictable and sporadic. The odd and sometimes delusional thinking patterns would be a safety risk in any employment situation - as patient would likely determine on course of actions and not follow basic rules and expectations.

(Id.)

The only countervailing opinions came from two state agency experts who never examined, treated, or even met Moffa. On July 28, 2021, Dr. Edward Jonas concluded based upon a review of Moffa's medical records that he was mildly impaired in terms of understanding instructions, and only moderately impaired with respect to interacting with others, maintaining concentration, and adapting to workplace changes. (Tr. 133-34). Dr. Jonas further found that in numerous spheres of workplace activity, Moffa was not significantly limited, and determined that he could perform simple tasks. (Tr. 138-40).

These findings were then echoed on reconsideration in September of 2021 by a second state agency expert, Dr. Erin Urbanowicz, who also concluded that Moffa suffered from nothing more than a moderate degree of impairment, was not significantly limited in many workplace arenas, and could perform simple tasks. (Tr.146-51). Of course, neither of these 2021 evaluations had the benefit of Moffa's

subsequent treatment records which showed that, beginning in November 2021 and continuing through the Spring of 2022, Moffa was consistently described as appearing "bizarre, toxic and unkempt" and his affect was characterized as "more anxious and more demented." (Tr. 554, 557, 560, 567, 570, 573, 582, 596). Further, the state agency experts had no opportunity to consider the fact that, throughout 2022, caregivers repeatedly stated that Moffa's: "Thought processes demonstrate delusional ideation, flight of ideas, illogical thinking and perceptual disturbances. Associative thinking is intact. Patient demonstrates bizarre delusions, depression and preoccupations." (Tr. 624, 627, 637, 642, 647, 653, 656, 659, 674, 677, 683, 686, 693, 698, 707, 714).

## D. **ALJ Hearing and Decision**

It was against this clinical backdrop that an ALJ conducted a hearing regarding Moffa's disability application on April 4, 2023. (Tr. 40-73). Moffa, his mother and a vocational expert both appeared and testified at this hearing. (Id.) In their testimony, Moffa and his mother described the severity of his emotional symptoms in terms that were largely consistent with the consensus views of his treatment providers.

Following this hearing on April 26, 2023, the ALJ issued a decision denying Moffa's application for benefits. (Doc. 14-28). In that decision, the ALJ first

concluded that Moffa had not engaged in substantial gainful activity since his May 3, 2021, application date. At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Moffa suffered from the following severe impairments: schizotypal disorder; other specific personality disorders; social phobia, generalized; anxiety disorder, unspecified; and attention deficit hyperactivity disorder (ADHD), combined type major depressive disorder, anxiety disorder, post-traumatic stress disorder, and bipolar disorder. (Tr. 19).

At Step 3 the ALJ determined that Moffa did not have an emotional impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 19-21). In reaching this result, the ALJ concluded that Moffa experienced no more than moderate impairments and rejected the more severe limitations on his functioning identified by all of the medical sources who had actually seen, examined and treated him. (Id.)

The ALJ then fashioned an RFC that rejected all treating and examining source medical opinions, finding that Moffa:

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to understanding, remembering, and carrying out simple instructions. He is limited to using judgment to make simple, work-related decisions. He is limited to work that involves no interaction with the public and only occasional interaction with coworkers and supervisors. He cannot perform work requiring a specific production rate.

(Tr. 21).

In reaching this conclusion, the ALJ essentially discounted all of the medical treating and examining source expert opinions, relying instead upon the opinions of state agency experts who had never observed Moffa. Thus, the ALJ concluded that Dr. Fleischman's opinion "is inconsistent with the overall evidence of record." (Tr. 26). Ignoring the longstanding longitudinal treatment history, the ALJ asserted that Moffa "experienced improvement in his symptoms when compliant with treatment (Exs. B4F, B5F, B6F, B9F)." (Id.)  Instead, the ALJ seized on a single treatment notation stating that "as paradoxical as this is expressed: patient is achieving a functional interaction with interpersonal relationships in the community" to find that Dr. Fleischman's opinion overstated Moffa's emotional impairments. (Id.)

The ALJ made similar findings expressed in similar terms when rejecting CRNP Weaver's medical opinion, noting that:

> This opinion is supported by an explanation. However, it is inconsistent with the overall evidence of record and in particular statements Mr. Weaver made during the course of treatment. For example, the claimant has no history of inpatient psychiatric hospitalization. He experienced improvement in his symptoms when compliant with treatment (Exs. B4F, B5F, B6F, B9F). The claimant is able to live independently. In addition, during the course of treatment, in September 2022, Mr. Weaver, described the claimant as "achieving a functional interaction with interpersonal relationships in the community" (Ex. B9F/183) . . . . For these reasons, Mr. Weaver's opinion statement is not found

16

consistent with the evidence of record as a whole, and it is not persuasive.

(Tr. 26).

Notably, the ALJ's consideration of these expert opinions failed to take into account that the state agency experts rendered their opinions in 2021 and therefore had no opportunity to consider Moffa's extensive and troubling treatment history in 2022 and 2023. Further, the ALJ's discussion of this treatment history was highly incomplete relying almost exclusively upon a single, admittedly paradoxical, treatment note to discount years of detailed records documenting severe, intractable emotional impairments. Finally, in rejecting these treating and examining source opinions, the ALJ cited Exhibit B6F as evidence which refuted these medical opinions. What the ALJ did not note, however, was that this exhibit was actually Dr. Fleischman's report which found that Moffa suffered from multiple marked impairments. Thus, the ALJ's decision seems to adopt an oddly paradoxical position, suggesting that Dr. Fleischman's opinion somehow is evidence which refutes Dr. Fleischman's opinion and the treating source opinion of CRNP Weaver, which both reached similar conclusions regarding he severity of Moffa's mental illness.

The ALJ then found that Moffa could not perform his past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 26-28). Having reached these conclusions, the ALJ determined that

17

Moffa had not met the demanding showing necessary to sustain his claim for benefits and denied this claim. (Tr. 28).

This appeal followed. (Doc. 1). On appeal, Moffa challenges the adequacy of the ALJ's explanation of this RFC determination, which rejected every examining and treating source medical source opinion relating to issues which are uniquely susceptible to assessment through direct observation in favor of medical opinions from sources who never treated, examined, or met the plaintiff. In our view the ALJ's responsibility of adequately articulating the basis for a medical opinion evaluation has not been met in this this case. Therefore, we will remand this case for further consideration and evaluation of the medical opinion evidence.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993).  But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

 The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial

evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777

20

F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

21

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and

(5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018

WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating

the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show

that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and

RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that

determination entails an assessment of what work the claimant can do given the

physical limitations that the claimant experiences. Yet, when considering the role

and necessity of medical opinion evidence in making this determination, courts have

followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and state that "[r]arely can a decision be

made regarding a claimant's residual functional capacity without an assessment from

a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d

at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7

(M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal

24

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here,  where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinions

Moffa filed his disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency;

relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

28

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at
*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.
Judicial review of this aspect of ALJ decision-making is still guided by several
settled legal tenets. First, when presented with a disputed factual record, it is well
established that "[t]he ALJ – not treating or examining physicians or State agency
consultants – must make the ultimate disability and RFC determinations." Chandler
v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating
medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence
for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision
is accompanied by an adequate, articulated rationale, it is the province and the duty
of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without
crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
"SSR 96–2p does not prohibit the ALJ from crediting some parts of a
treating source's opinion and rejecting other portions"); Connors v.
Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
10, 2011). It follows that an ALJ can give partial credit to all medical
opinions and can formulate an RFC based on different parts from the

29

> different medical opinions. <u>See e.g., Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

Finally, with respect to assessing competing medical opinion evidence, it is

clear beyond peradventure that:

> When a conflict in the evidence exists, the ALJ may choose whom to
> credit but "cannot reject evidence for no reason or for the wrong
> reason." <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993). The
> ALJ must consider all the evidence and give some reason for
> discounting the evidence she rejects. <u>See Stewart v. Secretary of
> H.E.W.</u>, 714 F.2d 287, 290 (3d Cir.1983).

<u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999).

It is against these legal benchmarks that we assess the instant appeal.

## D. <u>This Case Should Be Remanded for Further Consideration of the Medical Opinion Evidence.</u>

This case presents a striking circumstance. In fashioning an RFC for the

plaintiff, and denying this disability claim, the ALJ essentially rejected every

treating and examining medical opinion which consistently found that Moffa

suffered from marked and extreme limitations in terms of adapting to workplace

changes and interacting with others. Instead, the ALJ adopted the counter-intuitive

conclusion that doctors who have never seen Moffa are in a better position to assess

his ability to interact with others. In our view, the ALJ's justification for this course

of action is insufficient to warrant discounting this medical opinion evidence.

30

Therefore, we will remand for a more fulsome consideration of this medical opinion evidence.

In the absence of some further explanation and articulation of its rationale, the ALJ's decision cannot be reconciled with the medical opinion evaluation regulations that the ALJ was obliged to follow. Those regulations eschew any hierarchical ranking of opinions, but call upon ALJ's to evaluate medical opinions against the following benchmarks:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c.

In this case, a dispassionate assessment of the treating and examining source consensus regarding the severity of Moffa's emotional impairments against these regulatory criteria casts grave doubt upon the adequacy and accuracy of the ALJ's decision. At the outset, all of the factors relating to Moffa's relationship with these medical sources favored recognizing the persuasive power of these opinions. Thus, Moffa had a longstanding, first-hand treatment relationship with CRNP Weaver that involved repeated contacts over several years. Similarly, Dr. Fleischman had an actual opportunity to observe the plaintiff. Therefore, these treating and examining sources had a uniquely valuable longitudinal perspective on Moffa's mental state, in contrast to the state agency exerts who never met or examined the plaintiff.

Further, given that "supportability . . . and consistency . . . are the most important factors [to] consider when [] determine[ing] how persuasive [to] find a medical source's medical opinions . . . to be," 20 C.F.R. § 404.1520c(b)(2), we find that the ALJ's evaluation of these treating and examining source opinions failed to adequately address a critical factor: taken together, the opinions of Dr. Fleischman and CRNP Weaver are remarkably consistent in their evaluation of Moffa's mental state and ability to work. From two different medical perspectives, each of these sources reached consistent conclusions regarding the degree of Moffa's impairment, the extent to which he would be off-task, and the degree to which his impairments would result in chronic absenteeism from work. Given that consistency of opinions is one of the most important factors to assess in this medical opinion analysis, the ALJ's failure to address, or even acknowledge in a meaningful way, these remarkably consistent opinions requires a remand.

Further, when Moffa's treatment records are viewed as a whole, it is clear that these records fully support the treating and examining source medical opinions. These treatment records showed that beginning in November 2021 and continuing through the Spring of 2022, Moffa was consistently described as appearing "bizarre, toxic and unkempt" and his affect was characterized as "more anxious and more demented." (Tr. 554, 557, 560, 567, 570, 573, 582, 596). Further, throughout 2022,

caregivers repeatedly stated that Moffa's: "Thought processes demonstrate delusional ideation, flight of ideas, illogical thinking and perceptual disturbances. Associative thinking is intact. Patient demonstrates bizarre delusions, depression and preoccupations." (Tr. 624, 627, 637, 642, 647, 653, 656, 659, 674, 677, 683, 686, 693, 698, 707, 714).

The ALJ's decision seemingly discounts this entire extensive treatment history based upon a single, isolated, enigmatic, and admittedly paradoxical notation in Moffa's treatment files which stated that: "As paradoxical as this is expressed: patient is achieving a functional interaction with interpersonal relationships in the community." (Tr. 679). On this score, we note that there is something highly paradoxical about relying upon an admittedly "paradoxical" notation to discount a comprehensive treatment history spanning years. In this regard, the ALJ's decision runs afoul of the familiar proposition that the ALJ may not "cherry-pick" medical evidence. Rivera v. Astrue, 9 F. Supp. 3d 495, 505 (E.D. Pa. 2014). In this case, the ALJ erred by relying upon this single notation to essentially dismiss a much more extensive treatment history documenting pervasive and severe impairments.

Moreover, the ALJ's efforts to explain the rejection of these treating and examining source opinions rests, in part, upon yet another paradoxical proposition. The ALJ's decision cites Dr. Fleischman's opinion, Exhibit B6F, as evidence which

34

the ALJ contends refutes Dr. Fleischman's opinion and the treating source opinion of CRNP Weaver, both of whom agree that Moffa is severely impaired. The ALJ does not explain how the same evidence can both support and contradict this disability claim. Plainly, more is needed here.

Further, the ALJ's reliance on the state agency expert medical opinions, which were rendered in July and September 2021, failed to take into account subsequent significant medical developments which these state agency experts never had the opportunity to consider. Moffa's treatment records showed that, beginning in November 2021 and continuing through the Spring of 2022, Moffa was consistently described as appearing "bizarre, toxic and unkempt" and his affect was characterized as "more anxious and more demented." (Tr. 554, 557, 560, 567, 570, 573, 582, 596). Further, throughout 2022, caregivers repeatedly described Moffa's: "delusional ideation, flight of ideas, illogical thinking and perceptual disturbances. . . . bizarre delusions, depression and preoccupations." (Tr. 624, 627, 637, 642, 647, 653, 656, 659, 674, 677, 683, 686, 693, 698, 707, 714). In addition, by January 2023, Moffa had reported that his medication was no longer working to alleviate his symptoms.

"As a matter of law and common sense, material medical developments which take place after a state agency or consulting expert's review of a claimant's file frequently can undermine the confidence which can be placed in this non-treating

and non-examining source opinion." <u>Weller v. Saul</u>, No. 1:19-CV-884, 2020 WL 2571472, at *8 (M.D. Pa. May 21, 2020). Here, we find that there were material medical developments thoroughly documented in Moffa's clinical records after the last state agency evaluation in September of 2021 which significantly undermined the confidence which we can place on these non-examining source opinions. The ALJ's decision erred in failing to recognize this fact.

In our view, under the regulations governing evaluation of medical opinion evidence, more is needed by way of explanation in this case. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.  <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

36

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: February 24, 2025